Good morning, Your Honors. Russell Petty representing the Plaintiff Appellant and Cross Appellee, Robin Curran. I'd like to start this morning by talking about the standard of review, which is an issue that was briefed in one of their briefs, and I never got a chance to respond on the paper as to whether the standard of review with respect to the Harlech waiver issue, is de novo or a clear error. I submit that it's an issue of law which should be determined by this court de novo. I cited a case that's pretty much on point, the Fourth Circuit case of Brogan that stands for that proposition, and I'd like to take a moment here to sort of get below the details and explain, not just through authority, but why in fact it's an issue of law rather than an issue of fact. That's because there really isn't any factual dispute about the communications and nature of the communications, the specific words that were used from United to Ms. Curran and her counsel, with respect to the reasons why her claim was being denied. The denial letter is in the record before this court, as is the appellate letter and the various other communications, and they're all in writing, and no one disputes what they say. The actual dispute is the legal impact of that, like whether, for example, the fairly oblique references in the initial denial letter to the self-reported symptoms limitation constitutes notice to Ms. Curran that that was one of the basis of denial, and whether that notice legally is sufficient to comply with ERISA's command that there be a specific reason given. No, I get the point. The point is that everything was decided on the papers. We don't have determinations of credibility. I get it. Let me ask you a question on the merits. Thank you, Your Honor. Is it your position that none of the correspondence between the insurance company and your client prior to the denial letter can be looked at in determining whether she was on notice as to the reason for the denial that the insurance company now claims was the real reason? That's my position, Your Honor, although I'll say that even if you look at that stuff, there wasn't feral notice given. But the fact of the matter is insurance companies change their mind. They're allowed to change their mind. And what case law do you have that tells us that even if there was prior correspondence that might suggest some other possible reason, the only thing that your client is required to look to is the actual denial letter? Well, Your Honor, I would look, for example, to Martinez v. Beverly Hills Hotel, which I cited to the court, which stands for the proposition that it's the last, the appeal letter, that actually sort of controls what's going to be tried in court. The two letters serve a somewhat different purpose. I mean, the first letter, the first denial letter, is to let counsel know or the claimant know this is what I need to submit evidence on. The second letter is in order to, I mean, in part to sort of protect the record. Is the appellate process, the administrative process, actually over? If they've introduced a new ground, then maybe it's not. But it's to let counsel know what's got to be tried. I'm sorry, Your Honor. So your position is if there is an appeal and then a second letter that denies the appeal, the operative letter is the denial of the appeal? Yeah, although you could be prejudiced by either one. I mean, but what is going to be tried is going to be what's in the final denial letter because it's not outside the realm of possibility that the insurance company sets forth two grounds for denial and then at some point recognizes on appeal that one of them isn't valid. We have a case law that talks about substantial compliance with the notice requirement and looking at the whole course of communication and dialogue between the insured and the insurance company. What do we do about those cases? Well, you know, Your Honor, they really haven't. I've looked at some of those. They really haven't been briefed. You know, the insurance company didn't seem to take the position that the substantial compliance applied, you know, to the extent that this court wants to look at that issue. I'd appreciate an opportunity to provide supplemental briefing, but in brief, I mean, let's sort of look at the record as a whole. None of the experts were asked to issue an opinion as to whether the predicate facts behind the SRS limitation were met, which led to the unseemly process of people filing, you know, medical treatises and things to the district court so that the district court could figure this thing out. When you say none of the experts, who are you referring to? I'm talking to, for example, Mr. Crowley, the insurance company expert, the doctor who looked at the issue of whether Ms. Koran was disabled. He was asked about Ms. Koran's restrictions and limitations, but he was not asked, you know, does she have symptoms which could only be diagnosed subjectively? Does she have a medical condition which could only be diagnosed subjectively? That's the, you know, the issue with respect to the self-reported symptoms limitation. He wasn't asked that. Nobody else was ever asked that, and as a result, there really isn't any medical evidence in front of the court as to whether the terms of the self-reported symptoms limitation are met. But, you know, there's only a blank reference in the denial letter. Well, I mean, I think you disregard it first because the denial letter, and I submit, Your Honor, that any fair reading of the denial letter will be that it's not denying the claim based on the self-reported symptoms limitation. The original denial letter in May 2011, I think, does say that's one of the bases. So you're talking about the denial of her appeal, right? No, Your Honor. Not the denial in May 2011. I'm sorry, Your Honor. The May 2011 denial letter, the initial denial letter, does not deny the claim based on the self-reported symptoms limitation. So, see, based on our review, your request for benefits beyond January 20, the end of the 24-month self-reported symptoms provision has been denied. And then the provisions in your policy on which the denial of your claim is based states the following, and then they quote the plan's definition of total disability. I'm sorry, could you tell me the page you're reading from? Oh, ER 551 to 552. I've got it, but on a different part of the ER, so I've got the May 9 letter in front of me, so maybe what page of the letter? I'm looking at my notes on it, so I think it's the first and second pages. Yeah, so the first page says the provisions in your policy on which the denial of your claim is based on states the following, and then they cite the total disability, and then on the second page, which would be page two of the letter, they cite the self-reported symptoms section. That's all correct, Your Honor. They do say you're being paid under the self-reported symptoms limitation, or we're not going to pay you anymore. So the policy on which the denial of your claim is based states the following, and then they cite the total disability, and then they cite the self-reported symptoms. But then, Your Honor, if you look at the letter in context, it goes through the medical evidence, a very detailed review explaining why the medical evidence doesn't add up to Ms. reveals normal, objective, physical findings. Based on the information in file, you should be capable of performing in the same physical capacity as prior to your last day of work. Therefore, no benefits are payable, and your claim has been denied. We should not look at the first two pages of the letter, is what you're saying? Well, I mean, it does say in summary, Your Honor. I mean, I think it's a fair reading that when you say, in summary, this is why we're denying your claim, that any reasonable person is going to look at that and say, you know, this is why we're denying the claim. But, you know, we could parse, you know, back and forth about that, but I mean, the question I would have for United is, okay, if in fact you were intending to deny the claim based on the SRS limitation, why is that not in the appeal letter? In the denial of, you know, the final denial letter, why is there no reference whatsoever to the SRS limitation? Why is there no affirmative defense based on the SRS limitation? Why does the Rule 26 statement submitted jointly to both parties not only say on United's behalf, make no reference to the SRS limitation, but tell the district judge the only issue to be tried is whether Ms. Koran is disabled? You know, what we're doing here is we're looking at sort of stray references in this, you know, multi-thousand page file and fishing out a reference or two to the self-reported symptoms limitation and sort of ignoring the, you know, the forest, you know, for the sake of a few trees because, in fact, I'm sorry, Your Honor, go ahead. Lead me through what happened in the litigation, if you may. You made reference to it and it was described in your brief. So you file a complaint on behalf of your client. There's an answer. The trial counsel does, Your Honor. I was not. The trial counsel files a complaint. There's an answer. You're saying that in the answer there's nothing there that refers to the self-reported symptoms? That is correct, Your Honor. There's no, and it's an issue on which. Did I say yes or no? The answer is no, there's nothing in there. Okay, so then when we get to the Rule 26 colloquy, there's no reference to this? There's no reference to it. An express statement there that the only issue to be tried is disability. And when is the first time that the insurance company says, actually, we denied on the basis of self-reported symptoms? When trial briefing started, Your Honor. When trial briefing started. Now, tell me what trial briefing means. Is that pretrial briefing? Yeah, I mean, in these ERISA cases, you've got an opening brief, a responsive brief, typically, and then you have a trial. So it was about a month before trial was the. . . The first time it's mentioned. The first reference that I've been able to ascertain from the record, Your Honor. As I say, I'm just a appellate counsel. Okay, but it appears then from this sequence that when the insurance company first looks at this lawsuit, it thinks that it denied based upon lack of total disability rather than based upon the self-reported symptoms. The evidence makes that clear that that's exactly what's going on here. This is something that, you know, their litigation counsel looked at as they were sort of getting ready for trial briefing and said, hey, we've got this other argument in there. Let's put it in there. The problem, of course, is that if Ms. Coran wasn't put on notice in this back in the day so she could submit evidence, her lawyer was not put on notice of this during the appellate process to know, hey, this is something that I need to take care of. I need to make a motion to submit additional evidence under a body in a timely fashion. You know, you have a situation where there's an issue being tried that resolves an important right of Ms. Coran, and she's never been given an opportunity to submit evidence on that. I submit that, you know, forget about a violation of. . . Well, you know, that may be an overstatement. You say that it's first raised in the pretrial briefing. It sounds as though if it's pretrial briefing, she has an opportunity to present evidence on the question that's now been raised in the pretrial briefing. Well, you know, the problem, of course, is that, you know, in ERISA. . . That they're too late in raising it. But when you say she has no opportunity to present evidence, that doesn't sound like that's true. Well, you know, I mean, typically these ERISA cases are tried on the administrative record. You're not given an opportunity to submit additional evidence, and the rationale for that is that you had your opportunity to submit the evidence. I see what you're saying. This is to say the administrative record is what it is, and she can't expand it. And she can't expand it even at the time the lawsuit is initially filed. That's correct. I mean, there are some exceptions to that. It doesn't matter what's put into the initial documents at trial, is what you're saying, because the administrative record is fixed. The administrative record. . . So the evidence is what it is at that point. It's typically fixed. There are some exceptions. And to be frank, I think some of those exceptions, at least one of them, the one from a body, may apply here. But, you know, you need some deliberation and opportunity to figure that out. I mean, the initial grant of benefits was done under the self-reported symptoms section. That is what the initial letter approving benefits says. Exactly. That's correct, Your Honor. So it was known that that was their grant of benefits was under that. And isn't it true that during the treatment process and the back and forth with the insurance company, that Ms. Koran didn't provide any objective evidence of her diagnosis? That's incorrect, Your Honor. I mean, that's what United says. But as a matter of fact, there is objective evidence in the records. She didn't have the pressure test performed that would be a confirmation of the condition. Trigger point testing. Trigger point. I'm sorry. I see the court's question, and I misunderstood it. She did have the trigger point. I mean, Dr. Whiteman, in his letter during the. But that wasn't submitted until there was a motion to 5090, I think it was. Well, that's correct. But I mean, the question. It wasn't in the medical records, in the administrative records. The question is, was it done? And Dr. Whiteman says it was done. Not, you know, afterwards. It was done back in the day. You just couldn't read his medical records to ascertain that because the medical records were not. He doesn't say that in the letter, does he? He does say that. I mean, he wasn't. He doesn't say that he did it or that it was in his records. It was very ambiguous. I thought the record was clear on that point that that test was not performed. Yeah. Well, he said that he did do that testing, and it's in his letter. If I can just drag up the letter very quickly. Well, the record that was in front of the district court at the time it originally made its decision doesn't show that the test was performed. Now, Dr. Whiteman might have performed it, but his notes were illegible. Now, when he submits the letter or when the letter is submitted after the initial judgment, then he says, I performed the test. He says, my clinical notes are difficult to read and may not reflect the specific testing I did. So he doesn't say it was in his notes. No, he does. Right above that, Your Honor, and we're in the record at page 97, Your Honor. He performed clinical tests suggested to diagnose fibromyalgia, that is applying pressure to various tender points of the body with the response being pain. But he doesn't give any report of his testing. He says, Ms. Curran's response when tested confirmed my diagnosis. But then he says his notes may not reflect the specific testing I did. He says it's just routine for him to do it. So he doesn't say that that test result is in his notes. But he says he performed the test, and his notes are unclear, and he's not a great report writer as I think anyone looking at his medical records would concede. I'm well over time. Why don't we hear from the other side, and we'll give you a chance to respond. Your Honor, I appreciate that. Thank you. May it please the Court, I'm Jenny Wang on behalf of the United of Omaha. Your Honors, I'd like to start as well by addressing the standard of review. And the standard of review here must be clear error. The district court reached its findings after carefully reviewing the evidence following a bench trial and made a determination based upon its evaluation of the communications back and forth from United of Omaha and Ms. Coran. But we don't have anything other than pieces of paper, correct? We don't have live testimony. She says this, he says that, conflict in the testimony. It's all on paper, right? That's correct, Your Honor. The evidence was limited to the documents in the administrative record. And the district court's role in what it did was evaluate that evidence on paper. But the question then is not what's true. The question is what's the significance of what we have on paper. It's an interpretation of who was told what and when. And what did Ms. Coran know? I think you and I are saying the same thing. The only evidence we found of the district judge is something that's on paper. Correct. And the question is what legal conclusions do we draw from what's on paper? That's correct. And I would submit, Your Honor, that that is a highly factual inquiry that's entitled to deference and that is subject to the clear error standard. Now, I'd like to address counsel's point that only the final denial letter of March 2012 can be considered in determining whether or not Ms. Coran had adequate notice of this SRS limitation. And I would submit, Your Honor, that that is completely incorrect. What the ERISA regulations require is an informative communication back and forth between the insurance company and the claimant that adequately apprises the claimant of the determination on the claim and the reasons for the determination so as to enable the claimant to be able to rebut that determination if it's adverse to her. I want to make sure I understand what you're saying. Are you saying that communications prior to the denial letter are relevant to determining the reasons for the denial? Absolutely, Your Honor. That seems to me inconsistent with what we wrote in Booton. In Booton we say, and we just quote the statute, under federal law an ERISA plan quote shall provide every claimant who is denied a claim written notice setting forth the manner calculated and understood by the reasons for the denial. Now, until you get the denial, you can't give the reasons for the denial. And then we write, if benefits are denied in whole or part, the reason for the denial must be stated in reasonably clear language with specific reference to the plan provisions that form the basis for the denial. That is to say, I think we have to look at the denial and the back and forth that occurs before then we don't look at. As I read both the regulation and as I read Booton, we look at the denial. And when you look at the denial, Your Honor, let's look at the denial. Let me make sure, if you and I are still on the same page, are you conceding that we only look to the denial? No, Your Honor. And here's why, and let me explain. First of all, the denial does not consist solely of the final denial letter in March of 2012. It also consists of the initial denial in May of 2011. That is the crucial denial because that is the mechanism by which Ms. Koran is informed of the claim determination and the basis for it so that she can submit whatever information she deems necessary to be able to rebut that determination on appeal. So the May 2011 letter is the crucial communication. Okay, but are you saying that the earlier communications we don't look at? I don't think you're quite saying that. I am not saying that, Your Honor. The earlier communications set the framework for the initial denial letter that goes out in May of 2011. And the critical pre-May 2011 communications are, first, in 2009, when Ms. Koran is notified that her claim is approved, United of Omaha writes to her and says, We are approving your claim based on this 24-month SRS limitation. That means that your benefits will exhaust in two years in January of 2011. The next year, in 2010, United of Omaha writes to her and reminds her, Remember, we're paying you under this SRS limitation of 24 months. That means your benefits will run out next year in January of 2011. In January of 2011, Ms. Koran writes to United of Omaha and says, I've been disputing your characterization of my claim as falling within this SRS limitation, and I think I should be paid beyond the 24 months. That was in January of 2011. In May of 2011, that's when United of Omaha sends the initial denial letter to her, and in the very first paragraph says, This is in response to your request for benefits beyond the 24-month self-reported period. And we are denying your request, and here are the planned provisions that we're relying on to deny your request. And then United of Omaha goes on to quote, The total disability definition and the SRS limitation. And then when they finally say, I'm now on page ER555, the paragraph that was read to us a moment ago, in summary, reveals normal objective physical findings. Based on the information in the file, you should be capable of performing in the same physical capacity as prior to your last day of work. Therefore, no benefits are payable. No mention of the self-reported symptoms. So that looks to me as the reason for the denial. The rest of it looks like preliminary stuff. When we get to the appeal denial, which comes later, there's no mention of SRS at all. There is not a mention of the SRS provision in the final denial letter. There's no quoting of that provision in the final denial letter. But let me go back. I don't think there's a reference to it. There's not a reference in the final denial letter, but again, Your Honor, that communication must be examined within the context of the company's prior communications with Ms. Coran. And let me go back to that May 2011 letter, because there's a very important part that I think we're overlooking in that letter that's important to whether or not she had adequate notice. So the May 2011 letter starts off saying, we're denying your request beyond the 24 months based on the total disability definition and the SRS limitation. And then there's a conclusion that Your Honor read. But in between is an exhaustive explanation of the reasons for the determination. And the explanation is, if you read it, there is no objective evidence to substantiate any of the conditions that you claim are rendering you disabled, including the lack of trigger point testing as required by the American College of Rheumatology. So in May of 2011, when the claim is denied, Ms. Coran is on notice that the SRS limitation is in play and that the reason it's in play is because of the myriad of different ways, as explained to her in the denial letter, that her claim is lacking in objective evidence, i.e. it only consists of self-reported symptoms, and that the lack of trigger point testing is an important basis for the claim determination. So when you get to March in 2012, and by that time, she's represented by a very capable counsel who has the benefit of all of these communications between Ms. Coran and United of Omaha, and they know that the lack of trigger point testing is an important consideration. After the appeal process plays out, United of Omaha says, the prior determination we have deemed is correct. And then it goes on to explain in multiple pages, again, the myriad of ways in which the claim is lacking in objective evidence, including, again, the lack of trigger point testing, the fact that the Lyme disease lab results came out negative, the nerve conduction studies, the EMGs, were negative, the neurocognitive test results were within the expected range, the myriad of different ways in which the SRS limitation applied. And I grant you, absolutely, the letter does not, again, mention the SRS limitation, but remember, by this time, she's been told three separate times in writing that this limitation applies and that there are a number of ways in which your claim is lacking objective evidence. Now, let me move on, Your Honor, to the allegation that this SRS limitation was raised for the first time in trial briefing. Absolutely incorrect. The answer to the complaint is part of the record on appeal. And I'm now referring to 1368 through 1370 of the excerpts of the record. And let me turn your attention to 1370, if I may. And this is in paragraph, this is in response to allegations in the complaint that the claim had been denied pursuant to the SRS limitation. And United of Omaha alleged plaintiff's benefits expired in January 2011 under the plan's limitation for self-reported symptoms. Very next paragraph, another reference to the SRS limitation. Defendant admits that plaintiff requested that evaluation of her claim for payment beyond the 24-month limitation for self-reported symptoms, that she made that request. ER 1368. United, in its answer, lays out the fact that it had approved her LTD claim initially under the 24-month SRS limitation. So this is all over the place in terms of the answer. Counsel was on notice of it. In the joint report, again, and this is at ER 1374, United of Omaha reiterates that her claim was exhausted under the SRS limitation. So there was absolutely no ambushing of counsel on this issue at all. They were on notice of it from the outset of the claim. Is that trigger test the only objective evidence of conditions like fibromyalgia and chronic fatigue and so forth? It isn't, Your Honor. So is there other evidence that she could have gathered if she had chosen to do so? Presumably, yes, Your Honor. These kinds of cases are troublesome to the courts. I can speak most authoritatively about that to the district court because it's in the nature of the condition that it doesn't give rise to objective verification. And so what is an insured person supposed to do beyond self-report what the condition is doing, what the effect of it is, that entitles the person to disability benefits? Well, United of Omaha addressed that in both of its denial letters, Your Honor, including the fact that she could have gone out and gotten the trigger point testing. Now let me address Mr. Whiteman's. On that point, I'm now reading from Booten again, and this is what we write. If the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. So you say she could have gone out and got it. Well, as I read Booten, Omaha should have told her to go get it. That's effectively what the company did in the May 2011 letter. Exactly what they did. They denied it, and they said, in summary, we deny because you are not completely disabled. They referred to the 24-month self-reported symptom earlier on, but nowhere did they say if you want benefits beyond the 24 months, go out and get this test performed. They never said that. They didn't say those exact words, Your Honor, but they did say you have not been diagnosed, and explaining the different ways in which her claim lacked objective evidence, they said you have not been diagnosed with trigger points according to the American College of Rheumatology guidelines. And so that's basically a way of telling her you can go out and get your trigger points tested. That's a pretty indirect way of saying it. I see the language. It says in the medical analysis, notes are revealed that you have had a variety of complaints and a history of anxiety and depression. It has been suggested that you suffer from fibromyalgia with no confirmed diagnosis of tender points by any of your treating providers as required by the American College of Rheumatology diagnostic guidelines. That's all they say. It has been suggested that, da-da-da. That's far short of if you want to get your benefits, you better get the testing done. Or some testing. She also claimed she had Lyme disease. Is there a way to objectively prove Lyme disease? There is, Your Honor, and there are a couple of ways to do that. One, you can get a blood test, and there's actually a marker that comes out positive. And Lyme disease patients also typically get a characteristic bull's-eye rash, which she was evaluated for, and she reported no such history, which is what caused a couple of her treating physicians to say, we don't think you have Lyme disease. The lack of negative lab testing and the lack of the characteristic rash. So that's objectively provable, but in order to do it you have to have something in your blood that would show up on these tests. Is that correct? That's true, Your Honor. That's true, Your Honor. And my time has run out, so I would submit that the district court's factual findings are at least, at the very least plausible based upon the evidence and should be affirmed. Thank you, Your Honors. Thank you. Would you like two minutes? I most certainly would, Your Honor. Thanks very much. I'll try to take less than that. The game we're playing here, Your Honors, is sort of wandering through a fairly extensive record and kind of picking out little bits and pieces that sort of refer to objective evidence or refer to the self-reported symptoms limitation. But what United isn't able to do is point to any place where they come out and say, we're denying your claim based on the self-reported symptoms limitation, or we're denying your claim because you fail to meet or you fail to have objective evidence and, therefore, it doesn't meet the self-reported symptoms. That's not precisely correct, right? Because that's exactly what they say in the May 9, 2011 letter. We're denying your claim based on these two provisions. One of them is the self-reported symptoms. No, Your Honor. I mean, I wouldn't characterize it quite like that. What they say, they start off by saying your claim for benefits beyond the 24-month self-reported symptoms limitation has been denied. Then it proceeds. It doesn't say, you know, because of these, it then proceeds to just sort of. . . It says based on these two provisions in your plan. The provisions in your policy on which the denial of your claim is based on states the following, and then they cite the self-reported symptoms. So I don't think it's quite correct to say that they don't state that the basis for denial is self-reported symptoms limitation. You know, Your Honor, I'm afraid I just don't agree with that. I mean, they say we're not going to pay beyond the 24-month limitation. They cite some plan provisions. One of them is the 24-month limitation. Then they walk through the medical evidence, and they summarize, and they say we're not going to pay your benefits because we think you're not disabled. But, again, if that is in fact. . . If the insurance company is entitled to, or is obligated, I'll say it that way, is obligated to provide notice of the reason for denial of benefits. And there's a series of communications that precede a final decision. Why can't it pull forward all of the elements of that communication? There's nothing inconsistent that has cropped up as a basis for the refusal. All of that information comes forward and constitutes the corpus of the decision-making requirements that the insurance company complied with. Well, the reason why is because the case law, the regulations, and, in fact, the plan here, require that the final denial, the uphold letter, contain the specific reason or reasons why the claim is being denied. By the way, I didn't cite to the. . . It's in the record at 262 where the plan itself requires the appeal letter to contain a specific reason. Not just the original denial letter, but the appeal letter. There's a separate regulation section where they talk about what's required in the notice of decision on appeal. And that also, that's at 29 CFR 2560.503-1I1. That also requires, you know, at that one specific letter, not sort of the cumulative effect of everything that we've said, but in that letter that it lists the specific reason for the denial. It just wasn't done here. It's a blatant and gross violation of the provisions of ERISA, and there's just no other way to look at it. Okay. Thank both sides for their helpful arguments. Thank you, Your Honors. The case of Graham v. United of Lomaha Life Insurance submitted for decision.
judges: W. Fletcher, Ikuta, Barker